Filed 3/14/22  P. v. Cervantes CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074437 |
| v. | (Super.Ct.No. INF1402145) |
| NESTER CERVANTES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Johnnetta E. Anderson, Judge.  Affirmed in part; reversed in part with directions.

Michelle Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Melissa Mandel and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I.  INTRODUCTION

A jury found defendant and appellant Nester Cervantes guilty as charged of the first degree premeditated murder of Chris Aguilar on July 20, 2014.  (Pen. Code, §§ 187, subd. (a), 189, subd. (a).)[1]  The jury also found true an allegation that defendant personally and intentionally discharged a firearm causing great bodily injury or death in the commission of the murder.  (§ 12022.53, subd. (d).)  Defendant was sentenced to 50 years to life:  25 years to life for the murder, plus 25 years to life for the firearm enhancement.

In this appeal, defendant claims:  (1) insufficient evidence shows the murder was willful, deliberate, and premeditated; (2) the court erroneously failed to instruct sua sponte on the "subjective" meaning of provocation for purposes of second degree murder; (3) the prosecutor prejudicially misstated the law during closing argument; (4) the trial court abused its discretion and violated his right to a jury trial in failing to investigate a report of a juror's possible misconduct during jury deliberations; (5) remand for resentencing is necessary for the court to consider sentencing him on a lesser, uncharged firearm enhancement; and (6) the unpaid portions of his $514.58 booking fee and $1,095 for the costs of the presentence investigation report must be stricken from the judgment pursuant to Assembly Bill No. 1869 (2019-2020 Reg. Sess.).

We agree that any unpaid portion, as of July 1, 2021, of the booking fee and the cost of the presentence investigation report must be stricken from the judgment.  (Gov.

---

[1]  Undesignated statutory references are to the Penal Code.

2

Code, § 6111, subd. (a); Pen. Code, § 1465.9, subd. (a).) We also agree that the matter must be remanded for resentencing so the court may consider exercising its discretion to strike the section 12022.53, subdivision (d) firearm enhancement and impose a lesser enhancement under subdivisions (b) or (c) of section 12022.53. We reject defendant's other claims of error; thus, we affirm the judgment in all other respects.

## II. BACKGROUND

On July 20, 2014, defendant went shooting with L. and N. That day, a photograph was taken of the three of them, showing defendant holding a revolver and L. holding a semiautomatic firearm. Later that evening, defendant, L., and N. were in the courtyard of defendant's apartment complex in Indio, hanging out with several others, including R. and C. Aguilar lived near the complex.

Around 8:00 p.m., Aguilar and his cousin, G., approached the group. Aguilar asked the group whether he could buy some "weed" or marijuana, but one or more members of the group said they did not have any marijuana and asked Aguilar to leave. R. later told a detective that "it seemed like" Aguilar and G. were "stirring up trouble." The group "hated" Aguilar's brother and had a "green light" on the brother because of "something that happened."

Defendant stepped away from the group, spoke with Aguilar and G. for a few minutes, and may have argued with Aguilar. After speaking with defendant, Aguilar and G. began walking away. At that point, defendant fired a round from his revolver, either into the air or the ground. Aguilar and G. then returned to the group. Aguilar said

3

defendant had offended him by firing the revolver and told defendant to empty the gun and give it to him.

Defendant initially resisted Aguilar's demands. He told Aguilar he was only trying to clear the revolver's chamber, and he would "never do nothing" to Aguilar because he had known Aguilar for two years. But after Aguilar said, " 'Do you know who the fuck I am?' " and " 'Give me the toy,' " defendant emptied the bullets from the revolver into his front pants pocket. Aguilar then asked whether anyone else in the group had a gun, and the group members said, "Nah." Aguilar then pulled out a knife, held it to defendant's throat, and told G. to get the revolver from defendant. Aguilar also said that he and G. would leave if they, the group, would give him the revolver. The revolver fell to the ground, G. picked it up and ran, and Aguilar walked away.

Defendant was "mad." As Aguilar was walking away, L. displayed a nine-millimeter handgun from his waistband and said, " 'Give me the gun back and everything will be okay.' " At this point, defendant told L. that Aguilar was "talking shit" and asked L. for L.'s handgun. L. then gave defendant L.'s handgun.

As Aguilar continued to walk away, defendant raised L.'s handgun and "cocked it." Aguilar looked back and saw defendant, six-to-seven feet away from him, pointing the gun at him. Aguilar said, " 'Kick it, kick it,' " meaning "relax" or "hold on." Defendant said, " 'Fuck that,' " and fired the handgun at Aguilar as he walked toward Aguilar, emptying the magazine of its 12 rounds. Six to seven of the 12 fired rounds hit Aguilar.

After Aguilar fell to the ground, defendant stood over him and asked, " 'Mother fucker, you are going to do that to me?' "  He then beat Aguilar in the face with the handgun, inflicting multiple facial lacerations and dislodging several of Aguilar's teeth.

Aguilar died from multiple gunshot wounds.  A gunshot wound to his chest penetrating his lung and heart was fatal.  Another gunshot wound to the center of his lower back hit his iliac vein and was likely fatal.  The other gunshot wounds were to his arms and buttocks.  Defendant fled the scene and was arrested five days later.

### III.  DISCUSSION

A.  *Substantial Evidence Shows Defendant Acted with Premeditation and Deliberation When He Shot and Killed Aguilar*

The jury was instructed it could find defendant guilty of first degree murder, rather than second degree murder, if it found he acted willfully and with premeditation and deliberation when he shot and killed Aguilar.  (CALCRIM No. 521.)  The jury found defendant guilty of the murder and found true the allegation that he committed it willfully and with premeditation and deliberation.  Thus, the murder was first degree murder. Defendant concedes the evidence is sufficient to show he acted willfully—with intent to kill—but argues that it is insufficient to show he acted with premeditation and deliberation when he shot and killed Aguilar.  Rather, he argues all of the evidence shows he acted rashly, without any planning or any motive to kill, after Aguilar held a knife to his throat and took his revolver.  We find no merit to this claim.

5

1. Standard of Review and Legal Principles

In reviewing a claim that insufficient evidence supports a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could have found defendant guilty of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578; *People v. Perez* (1992) 2 Cal.4th 1117, 1124 [considering substantial evidence of premeditation and deliberation].)  The standard of review is the same when the People rely primarily on circumstantial evidence.  (*People v. Perez*, at p. 1124.)  " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' "  (*People v. Bean*  (1988) 46 Cal.3d 919, 933.)

The jury was instructed pursuant to CALCRIM No. 521 (first degree murder; Pen. Code, § 189) that it could find defendant guilty of first degree murder if it found he acted willfully and with premeditation and deliberation when he shot and killed Aguilar:  "The defendant is guilty of first degree murder if the People  have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted *willfully* if he intended to kill.  The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if he decided to kill before completing the act that caused death.  [¶]  The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated.  The amount

of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time." (CALCRIM No. 521.)

Premeditation and deliberation are not to be confused with willfulness or intent to kill. "Premeditation and deliberation require 'substantially more reflection; i.e, more understanding and comprehension of the character of the act than the mere amount of thought necessary to form the intention to kill.' " (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 822-823, quoting *People v. Wolff* (1964) 61 Cal.2d 795, 822.)

Our Supreme Court has identified three "basic categories" or types of evidence that will generally furnish a "reasonable foundation" for an inference of premeditation and deliberation, when, as here, the evidence of premeditation and deliberation is circumstantial: (1) planning activity, (2) a motive for the killing, and (3) the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 25-27 (*Anderson*).)[2]

---

[2] *Anderson* elaborated: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [Citation]; (3) facts about the nature of the killing from which the jury could infer that

*[footnote continued on next page]*

*Anderson* noted that the court had upheld first degree murder verdicts, "typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Anderson*, *supra*, 70 Cal.2d. at p. 27.) But as our high court later observed, "*Anderson* does not require that these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. *Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." (*People v. Manriquez* (2005) 37 Cal.4th 547, 577; see *People v. Perez*, *supra*, 2 Cal.4th at p. 1125 ["The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive."]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 420 ["Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight."].)

2. Analysis

Defendant claims none of the *Anderson* factors are present here. Nor, he argues, does any other evidence show he acted with premeditation and deliberation. Regarding planning activity, he argues, "the evidence makes clear that [he] could not have and did not plan to kill Aguilar. Indeed, [he] was simply 'kicking back' and hanging out with his

---

the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)

friends . . . when Aguilar and [G.] approached [his] group of friends, in an apparent attempt to buy marijuana." Regarding motive, he argues, "there was nothing in the record to suggest" he had a "clear motive" that would support premeditation. Lastly, he argues that the manner of the killing also "failed to show a preconceived plan." In sum, he claims the record shows he shot and killed Aguilar based on an "unconsidered or rash impulse, hastily executed," rather than following "the sort of 'preexisting reflection' and 'careful thought and weighing of considerations' required to find premeditation and deliberation." (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268.)

The People maintain that all three *Anderson* factors are present. They argue the evidence supports reasonable inferences that (1) defendant planned the murder by arming himself, first with his revolver, then with L.'s handgun; (2) defendant had a motive to kill Aguilar after Aguilar disrespected and embarrassed him in front of his friends by holding the knife to his throat and demanding his revolver, and (3) the manner of the killing and defendant's actions after the killing show he acted with premeditation and deliberation.

As indicated, it is unnecessary to parse the evidence in terms of whether it shows defendant planned the killing, had a motive for the killing such that he would have premeditated and deliberated it, or whether the manner of the killing shows he acted with premeditation and deliberation in committing it. (*People v. Halvorsen*, *supra*, 42 Cal.4th at p. 420.) Regardless of how the evidence is analyzed, substantial evidence shows and the jury reasonably found beyond a reasonable doubt that defendant acted with premeditation and deliberation when he shot and killed Aguilar.

9

The evidence shows that Aguilar put a knife to defendant's throat and demanded that defendant hand over his revolver after defendant fired a round from the revolver into the air or the ground. As Aguilar held the knife to defendant's throat, the revolver fell to the ground, G. picked it up and ran, then Aguilar began walking away. At this point, defendant was angry or "mad." By the time Aguilar had walked six to 10 feet away from him, defendant had asked for and obtained L.'s nine-millimeter semiautomatic handgun and was pointing it at Aguilar. Aguilar turned, saw defendant pointing the gun at him, and said, " 'Kick it, kick it,' " meaning relax or "hold on." Aguilar responded by saying, " 'Fuck that,' " and proceeded to fire all 12 rounds of the handgun at Aguilar as he walked toward Aguilar. He then stood over Aguilar's body, swore at Aguilar for assaulting him—"Mother fucker, are you going to do that to me?"—and pistol-whipped Aguilar in the face, dislodging several of Aguilar's teeth.

All of this evidence supports a reasonable inference that defendant acted willfully, and with premeditation and deliberation, when he shot and killed Aguilar. The jury could have reasonably inferred that defendant formed the intent to kill at the time or shortly after Aguilar assaulted him with the knife. As the prosecutor argued, "Did he decide to kill before committing the act that causes death? The taking of the gun from [L.] and turning and raising. The aiming, the firing. The decision to kill has been formed at that moment." Indeed, defendant does not dispute that substantial evidence shows he intended to kill Aguilar.

Substantial evidence also shows defendant premeditated and deliberated the murder shortly before he shot and killed Aguilar. When he asked for L.'s handgun,

10

defendant said, " 'He is talking shit,' " referring to Aguilar.  He then raised L.'s handgun and cocked it.  Around this time, Aguilar looked back and saw defendant, six to 10 feet away from him, pointing the gun at him and said, " 'Kick it, kick it,' " meaning "relax," or "hold on."  Aguilar's pleas provided defendant an opportunity for reflection and deliberation on his proposed actions.  Having considered Aguilar's pleas, and demonstrating that he had deliberated, defendant then said, " 'Fuck that,' " and fired the handgun 12 times as he walked toward Aguilar, emptying the gun's magazine of its 12 rounds.

All of this evidence shows defendant quickly premeditated and deliberated the murder in the moments before he shot and killed Aguilar.  As the jury was instructed and the prosecutor argued, the process of premeditation and deliberation does not require an extended period of time.  " ' "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' "  (*People v. Lee* (2011) 51 Cal.4th 620, 636; CALCRIM No. 521.)  A "preexisting reflection, of any duration," distinguishes first degree premeditated and deliberate murder from second degree murder.  (*People v. Solomon* (2010) 49 Cal.4th 792, 813.)  Thus, substantial evidence supports defendant's first degree murder conviction.

B.  *The Trial Court Did Not Have a Sua Sponte Duty to Instruct the Jury on the "Subjective" Meaning of Provocation for Purposes of Second Degree Murder*

Defendant claims the trial court prejudicially erred in failing to instruct the jury sua sponte on the "subjective" meaning of provocation for purposes of second degree

11

murder. He claims that provocation has a technical, subjective meaning peculiar to the law of second degree murder, and for this reason the trial court had a duty to instruct on that meaning sua sponte. We disagree that provocation has a technical meaning peculiar to second degree murder, or to negating premeditation and deliberation and reducing what would otherwise be first degree murder to second degree murder. Thus, the court did not have a duty to instruct on that meaning sua sponte.

      1.  <u>The Given Instructions on Murder, Manslaughter, and Provocation</u>

The jury was instructed on first and second degree murder (CALCRIM Nos. 520, 521) and on the lesser offense of voluntary manslaughter based on both a sudden quarrel or the heat of passion (CALCRIM No. 570) and imperfect self-defense (CALCRIM No. 571). The instructions on voluntary manslaughter told the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed because of a sudden quarrel or in the heat of passion (CALCRIM No. 570) or if the defendant killed in imperfect self-defense (CALCRIM No. 571).

CALCRIM No. 570 further instructed on the kind of provocation necessary to reduce murder to voluntary manslaughter based on a sudden quarrel or in the heat of passion: "The defendant killed someone because of a sudden quarrel or in the heat of passion if: (1) the defendant was provoked; (2) as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) [t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. . . . [¶] . . . [¶] It is not enough that the defendant simply was provoked.

12

The defendant is not allowed to set up his own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

The jury was also given CALCRIM No. 522 (provocation: effect on degree of murder). It told the jury that, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Defendant did not request a pinpoint instruction on provocation, or an instruction amplifying or clarifying the "subjective" type or meaning of provocation necessary to negate premeditation and deliberation, and reduce what would otherwise be first degree murder to second degree murder.

2. Analysis

It has long been established that provocation that is insufficient to negate malice and reduce murder to manslaughter, but that raises a reasonable doubt as to whether the defendant killed with premeditation and deliberation, can reduce what would otherwise be a first degree premeditated murder to second degree murder: "Provocation of a kind, to a degree, and under circumstances insufficient to fully negative or raise a reasonable doubt as to the idea of *both* premeditation *and* malice (thereby reducing the offense to

13

manslaughter) might nevertheless be adequate to negative or raise a reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree, i.e., an unlawful killing perpetrated with malice aforethought but without premeditation and deliberation." (*People v. Thomas* (1945) 25 Cal.2d 880, 903.)

These principles are reflected in CALCRIM Nos. 521, 522, and 570. CALCRIM Nos. 521 and 522 inform jurors that " 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*).) CALCRIM 570 informs jurors that "a reduction of murder to voluntary manslaughter requires more." (*Ibid*.) It instructs that "provocation alone is not enough for the reduction; the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*Ibid*.)

As courts have recognized, "[t]he test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective." (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.) In contrast, "[t]he test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder . . . is subjective." (*Ibid*.) Thus, while objective provocation is based on a reasonable person standard (*Jones*, *supra*, 223 Cal.App.4th at pp. 999, 1001; CALCRIM No. 570), subjective provocation " 'requires a determination of the defendant's subjective [mental] state' " (*People v. Middleton* (1997) 52 Cal.App.4th 19, 32, overruled in part on other grounds by *People v.*

14

*Gonzalez* (2003) 31 Cal.4th 745, 752; *People v. Fitzpatrick* (1992) 2 Cal.App.4th 1285, 1295).

Defendant claims that CALCRIM Nos. 521, 522, and 570 did not adequately describe the subjective provocation that can negate premeditation and deliberation and reduce a first degree premeditated murder to second degree murder. Rather, he argues, the instructions "were likely to have misled the jury into concluding that the objective test" applies both for "reduction from first to second degree murder as well as from murder to manslaughter." He claims the court had a sua sponte duty to instruct on the subjective provocation necessary to reduce first degree murder to second degree murder because subjective provocation has a technical meaning peculiar to the law of second degree murder. We disagree that provocation has a technical meaning, peculiar to the law of second degree murder, which differs from its commonly understood meaning.

We first observe that a trial court does not have a duty to give CALCRIM No. 522 sua sponte. That is, a court does not have a sua sponte duty to instruct on provocation "to the extent it 'bears on the question' whether defendant premeditated and deliberated"— that is, whether defendant was guilty of first or second degree murder. (*People v. Rogers* (2006) 39 Cal.4th 826, 878-879 (*Rogers*).) *Rogers* held that CALJIC No. 8.73, the CALJIC analog to CALCRIM No. 522, is a pinpoint instruction that courts do not have a duty to give sua sponte. (*Rogers*, at pp. 878-879.) As *Rogers* explained, pinpoint instructions " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case . . . . They are required to be given upon request when there is evidence

15

supportive of the theory, but they are not required to be given sua sponte.' " (*Id.* at p. 878, quoting *People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

Like its CALJIC 8.73 analog, CALCRIM No. 522 is a pinpoint instruction that the court does not have a duty to give sua sponte. (*Rogers*, *supra*, 39 Cal.4th at pp. 878-879; *People v. Rivera* (2019) 7 Cal.5th 306, 328; *People v. Hardy* (2018) 5 Cal.5th 56, 99 (*Hardy*) ["Instructions on provocation are pinpoint instructions that need not be given sua sponte but only on request."].) Because CALCRIM No. 522 is *itself* a pinpoint instruction, it stands to reason that any instruction specifically defining, clarifying, or amplifying the "subjective" meaning of provocation that can negate premeditation and deliberation, is *also* a pinpoint instruction that the court has no duty to give sua sponte. (See *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333-1334 (*Hernandez*) ["T]he fact that a trial court is not required to instruct on provocation for second degree murder *at all* supports that it is not misleading to instruction on provocation without explicitly stating that provocation can negate premeditation and deliberation."].)

As the People point out, defendant is actually arguing "that the court should have given a pinpoint instruction to inform the jury 'that the objective test did not apply to reduction of the degree of murder.' " (*Jones*, *supra*, 223 Cal.App.4th at p. 1001.) Defendant has forfeited his claim of instructional error by failing to request an instruction at trial, pinpointing his defense theory of provocation, or clarifying the "subjective" meaning of the provocation necessary to negate premeditation and deliberation. (*Ibid*; *Hardy*, *supra*, 5 Cal.5th at p. 99; *People v. Mayfield* (1997) 14 Cal.4th 668, 778-779, overruled in part on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 390.)

16

In any event, there was no error. Our Supreme Court has held that provocation, as used in CALJIC 8.73, "bear[s] [its] common meaning, which requires 'no further explanation in the absence of a specific request.' " (*People v. Souza* (2012) 54 Cal.4th 90, 118.) We are bound by this Supreme Court precedent (*Auto Equity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), and we discern no reason why it does not apply to CALCRIM No. 522.

Further, the courts in *Hernandez* and *Jones* concluded that CALCRIM No. 522 is not misleading when given with CALCRIM No. 521 (*Hernandez*, *supra*, 183 Cal.App.4th at pp. 1332-1335) or with CALCRIM No. 521 *and* CALCRIM No. 570 (*Jones*, *supra*, 223 Cal.App.4th at pp. 1000-1001), as occurred here. As *Hernandez* explained, "even without express instruction," CALCRIM Nos. 520 and 521 adequately inform the jury that "the existence of provocation can support the absence of premeditation and deliberation." (*Hernandez*, at p. 1334.) That is, CALCRIM Nos. 521 and 522 inform the jury that " 'provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation.' " (*Jones*, supra, 223 Cal.App.4th at p. 1001, quoting *Hernandez*, at p. 1334.) CALCRIM 570 further informs the jury that "provocation alone is not enough" to reduce murder to manslaughter; for manslaughter, "the provocation must be sufficient to cause a person of average disposition in the same situation, knowing the same facts, to have reacted from passion rather than judgment." (*Jones*, at p. 1001.)

Defendant attempts to distinguish *Hernandez* and *Jones* on the ground they did not address the precise argument he raises here—that subjective provocation has a technical

17

meaning peculiar to the law of second degree murder, or to negating premeditation and deliberation, and as such requires a sua sponte instruction explaining that technical meaning. He correctly observes that there are two exceptions to the rule requiring a defendant to request a pinpoint instruction, or an amplifying or clarifying instruction. The first exception applies when the given instruction is not legally correct. "Even if the court has no sua sponte duty to instruct on a particular legal point, when it does choose to instruct, it must do so correctly." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) The second exception applies when a term has a technical meaning peculiar to the law. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) Defendant relies on the second exception.

"In general the trial court has a sua sponte duty to give amplifying or clarifying instructions ' " where the terms used [in an instruction] have a technical meaning peculiar to the law." ' [Citations] Conversely, '[a] trial court has no sua sponte duty to give amplifying or clarifying instructions . . . where the terms used in the instructions given are "commonly understood by those familiar with the English language." ' " (*People v. Richie* (1994) 28 Cal.App.4th 1347, 1360; *People v. Rowland* (1992) 4 Cal.4th 238, 270-271.) In other words, "[a] word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*People v. Estrada* (1995) 11 Cal.4th 568, 574.)

Defendant claims that the "subjective" meaning of provocation, for purposes of negating premeditation and deliberation, differs from its commonly understood meaning, in that its commonly understood meaning "relates to the cause of the provocation, or to

18

the conduct that is the result of the provoking cause," as opposed to the defendant's mental state. He notes that "[t]he American Heritage Dictionary of the English Language (Fifth Edition 2011) defines provocation as: '1. the act of provoking or inciting; 2. Something that provokes.' " He also notes that "The Random House Kernerman Webster's College Dictionary (2010) defines provocation as: '1. The act of provoking. 2. Something that provokes, esp. by inciting, instigating, angering, or irritating.' " He claims that neither of these definitions "mentions anything about the effect of the provocation in terms of whether the defendant subjectively has been provoked or whether an ordinary person of average disposition would be provoked." This is patently not so. Something that provokes by " 'inciting, instigating, angering or irritating' " speaks directly to the effect of the provocation on the mental state of the person provoked. (*People v. Middleton*, *supra*, 52 Cal.App.4th at p. 32.) Simply put, provocation means to provoke a person's mental state to anger or emotion. This is the common understanding of the term provocation.

As discussed, *Hernandez* concluded that CACLRIM No. 522 was not incomplete or misleading because CALCRIM Nos. 521 and 522, taken together, informed the jurors that "provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) In reaching this conclusion, the *Hernandez* court observed that provocation, as used in CALCRIM No. 522, "was not used in a technical sense peculiar to the law" and assumed that the jurors were "aware of the common meaning of the term." (*Ibid*.) As *Hernandez* noted, "provocation means 'something that provokes,

19

arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 938; see *People v. Ward* (2005) 36 Cal.4th 186, 215 ['provocation . . . is the defendant's emotional reaction to the conduct of another, which emotion may negate a requisite mental state'].)" (*Ibid.*)

Defendant claims there are several problems with *Hernandez's* conclusion that provocation has a commonly understood meaning.[3] One is that the subjective, technical meaning of provocation is "not the narrow definition of provocation as something that provokes, arouses, or stimulates. Instead, it includes *an additional element related to the standard for determining how to apply the definition in terms of the defendant's mental state*." (Italics added.) He claims provocation has two technical meanings peculiar to the

---

[3] Defendant further argues that *Hernandez*'s conclusion that provocation, as used in CALCRIM No. 522, has a commonly understood meaning is "dicta" because the defendant in *Hernandez* did not claim that provocation has a technical, subjective meaning peculiar to the law. Rather, the defendant claimed that CALCRIM No. 522 was incomplete and misleading for three reasons: (1) it failed to specify that provocation can negate premeditation and deliberation, (2) it instructed that the jury could consider the significance of the provocation; and (3) it failed to state that provocation insufficient for manslaughter can be sufficient to reduce first degree murder to second degree murder. (*Hernandez, supra*, 183 Cal.App.4th at p. 1331.)

The *Hernandez* court's conclusion that provocation has a commonly understood meaning, rather than a technical meaning peculiar to the law, is not dicta. The court's discussion of the issue was necessary to its conclusion that CALCRIM No. 522 was not misleading for having failed to specify that provocation is relevant to premeditation and deliberation. (*Id.* at p. 1334; see *People v. Superior Court (Tejeda)* (2016) 1 Cal.App.5th 892, 903 [Only statements necessary to a court's decision are binding precedents, but it is often difficult to draw " 'hard lines' " between holdings and dicta.].) In any event, we find *Hernandez*'s reasoning on this point persuasive and adopt it here.

20

law:  an objective one for voluntary manslaughter based on the heat of passion and a subjective one for second degree murder.[4]

We disagree that the "subjective" meaning of provocation, for purposes of negating premeditation and deliberation, is a technical meaning that differs from its commonly understood meaning.  There is no "additional element" of provocation, peculiar to the law of first or second degree murder, beyond the common understanding of the term as something that provokes, arouses, or stimulates a person to anger or emotion.  (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.)  The commonly understood meaning of provocation—to provoke a person to anger or emotion—*is* its meaning for purposes of negating premeditation and deliberation, and for reducing what would otherwise be a first degree premeditated and deliberate murder to second degree murder.

Thus, there is no particular "standard for determining how to apply the [common] definition [of provocation] in terms of the defendant's mental state."  Indeed, defendant does not explain what this "standard" supposedly is.  And even if there is such a standard, CALCRIM Nos. 521 and 522, taken together, adequately informed the jury that

---

[4] Defendant argues *Hernandez* is also distinguishable because:  (1) the jury there was not instructed with CALCRIM No. 570, which would have "tether[ed] provocation to its effect on a person of average disposition"; and (2) *Hernandez* did not discuss the subjective standard of provocation in the context of second degree murder, or compare it with the objective standard required for voluntary manslaughter based on the heat of passion.  These distinctions are unimportant, in light of the subsequent decision in *Jones*.  There, the jury was given CALCRIM No. 570, and *Jones* discussed and rejected defendant's claim that CALCRIM Nos. 521, 522, and 570, taken together, were likely to have misled the jury to believe that an objective test, rather than a subjective one, applies to reduce first degree murder to second degree murder.  (*Jones*, *supra*, 223 Cal.App.4th at pp. 999, 1001.)

"provocation (the arousal of emotions) can give rise to a rash, impulsive decision, *and this in turn shows no premeditation and deliberation*." (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334, italics added.) CALCRIM No. 570 underscored this implication. It effectively informed the jury that *any provocation*, short of the objectively reasonable type that can cause a person of average disposition to act rashly and without due deliberation, can negate premeditation and deliberation. (*Jones*, *supra*, 223 Cal.App.4th at p. 1001.)

In sum, provocation does not have a technical meaning peculiar to the law of premeditation and deliberation, or to the distinction between first degree premeditated murder and second degree murder. (*Hernandez*, *supra*, 183 Cal.App.4th at p. 1334.) Thus, a court does not have a duty to instruct sua sponte on the "subjective" meaning of provocation for purposes of premeditation and deliberation. (*People v. Richie*, *supra*, 28 Cal.App.4th at p. 1360.) The subjective meaning of provocation is its commonly understood meaning. (*Souza*, *supra*, 54 Cal.4th p. 118.) Further, "[i]nstructions on provocation are pinpoint instructions that need not be given sua sponte but only on request." (*Hardy*, *supra*, 5 Cal.5th at p. 99; *Jones*, *supra*, 223 Cal.App.4th at p. 1001.) Because defendant did not request a pinpoint instruction on provocation, or an instruction amplifying or clarifying its meaning for purposes of negating premeditation and deliberation, he has forfeited his claim of instructional error. (*Hardy*, at p. 99.)

3.  No Ineffective Assistance of Counsel

Defendant claims his trial counsel rendered ineffective assistance, in violation of his constitutional right to effective assistance of counsel, in failing to ask the court to instruct on subjective provocation.  We find no merit to this claim.

On a direct appeal, we may reverse a conviction based on ineffective assistance of counsel only if the record affirmatively shows that counsel had no rational, tactical purpose for counsel's challenged act or omission.  (*People v. Ray* (1996) 13 Cal.4th 313, 349.)  Absent this showing, the ineffective assistance claim is more appropriately decided in a habeas corpus proceeding.  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)  The record here shows defense counsel had a rational, tactical purpose for not requesting an instruction on subjective provocation:  to argue that defendant was either (1) not guilty of any crime, or (2) was reasonably provoked, and was at most guilty of voluntary manslaughter based on the heat of passion.  These are the arguments that defense counsel emphasized during his closing argument.

Counsel more specifically argued defendant was not guilty of any crime because: (1) he acted in self-defense, or (2) L., the only person who had a nine-millimeter handgun, was "probably" the person who shot and killed Aguilar. Alternatively, defense counsel argued that defendant acted in the heat of passion—he was reasonably provoked—because Aguilar had just held a knife to his throat.

Based on the entire record, counsel could have reasonably believed that these arguments were more likely to prevail than an argument that defendant was at most guilty of second degree murder based on subjective provocation.  An instruction on subjective

23

provocation would have undermined counsel's arguments by emphasizing that defendant was guilty of second degree murder if he acted with subjective provocation.

C. *The Prosecutor Did Not Mislead the Jury During Closing Argument*

Defendant claims the prosecutor prejudicially erred during closing argument by misstating "the law regarding intent to kill and provocation as related to voluntary manslaughter." He specifically claims the prosecutor misstated the law in two respects, by telling the jury: (1) it could not find he acted based on reasonable provocation unless a reasonable person of average disposition would have reacted precisely as he did—by shooting Aguilar seven times and killing him; and (2) it could not find him guilty of voluntary manslaughter if it found he acted with intent to kill. (See CALCRIM No. 570.) We find no prejudicial prosecutorial error.[5]

1. Relevant Background

Defendant's claims of prosecutorial error are based on the following part of the prosecutor's closing argument: "If enough time passed between the provocation and the

---

[5] The People argue defendant has forfeited these claims of prosecutorial error by failing to object to the prosecutor's complained-of remarks during closing argument and requesting that the jury be instructed to disregard the remarks. (*People v. Stanley* (2006) 39 Cal.4th 913, 952 [" '[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' "].) Even if defendant has forfeited his claims of prosecutorial error, we exercise our discretion to consider the claims to determine whether the errors, if any, affected defendant's substantial rights. (§ 1259; *People v. Powell* (2018) 6 Cal.5th 136, 169.) We conclude that the errors, if any, were not prejudicial and thus did not affect defendant's substantial rights. (See *Ibid.*) As we explain, we discern no reasonable likelihood that the jury construed the prosecutor's remarks in the objectionable manner defendant claims.

killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis. The provocation must be something that would cause a reasonable person to act the same way. It is an objective standard. . . . How would a reasonable person behave in the same situation? *The answer is not by shooting him seven times. Then it is not voluntary manslaughter. It is a murder. If the answer is, you don't shoot someone seven times, mostly in the back, then it is not a ball. It's a murder. No heat of passion here.* [¶] He shot the victim while his back was turned away. . . . Think about how personal it can be when you are up close to someone's face. Right? That's not what happened here. The distance. He's got his back to him. He is walking away. The . . . victim pleads to the defendant, 'Kick it, kick it,' to not shoot him. And the defendant [says], 'Fuck that.' And shoots him anyway. And then from a position of advantage, he intended to use the gun. *The weapon in and of itself, the collection of a weapon and the use of that weapon shows that this is not a heat of passion. This is deliberate.* [¶] *This is showing judgment. This is showing the intent to kill.*" (Italics added.)

2. <u>Applicable Law and Analysis</u>

A prosecutor has a wide latitude to argue the case during closing argument. (*People v. Gamache* (2010) 48 Cal.4th 347, 371.) Thus, the prosecutor may urge the jury to draw all reasonable inferences based on the evidence, but the prosecutor may not "mislead the jury" (*People v. Daggett* (1990) 225 Cal.App.3d 751, 757-758) or "misstate the law" (*People v. Centeno* (2014) 60 Cal.4th 659, 666).

We agree that the prosecutor misstated the law to the extent he suggested to the jury that defendant was not reasonably provoked because a reasonable person would not have reacted the way he did—by shooting Aguilar seven times and killing him. Indeed, "[h]ow the killer responded to the provocation . . . is not relevant to sudden quarrel or heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.) In other words, how defendant responded to the provocation is not relevant to whether the provocation was sufficient to cause an ordinary person of average disposition to act rashly—or to *react* rashly—without deliberation, and with his reason and judgment obscured. (*Id.* at p. 223; *People v. Beltran* (2013) 56 Cal.4th 935, 949.)

We also agree that the prosecutor misstated the law to the extent he suggested that an intentional killing cannot be based on a sudden quarrel or in the heat of passion, that is, on reasonable provocation. "[A]n unlawful killing without malice (because of a sudden quarrel or heat of passion) is voluntary manslaughter," not murder, "regardless of whether there was an intent to kill." (*People v. Lasko* (2000) 23 Cal.4th 101, 109-110; see *People v. Bryant* (2013) 56 Cal.4th 959, 967 [" '[I]ntent to kill is not an element of the crime of voluntary manslaughter.' "].)

But these two errors or misstatements of the law do not require reversal. "To prevail on a claim of prosecutorial misconduct [or error] based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." (*People v. Frye* (1998) 18 Cal.4th 894, 970, overruled in part on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421.) On appeal, we independently examine the record to determine

26

whether there is a reasonable likelihood that the jury understood or applied the prosecutor's remarks in the complained of, objectionable manner. (*People v. Clair* (1992) 2 Cal.4th 629, 663.)

For several reasons, we discern no reasonable likelihood that the jury construed the prosecutor's remarks in the complained of, objectionable manner—as prohibiting the jury from convicting him of voluntary manslaughter either because (1) he intended to kill, or (2) because no reasonable person would have reacted to Aguilar's provocation the way defendant did—by shooting Aguilar seven times and killing him.

First, the prosecutor's complained-of remarks were made in the context of arguing to the jury that defendant acted with the intent to kill and with premeditation and deliberation. Given the context in which they were made, we believe the jury is more likely to have construed the prosecutor's remarks as argument or advocacy, rather than as statements or misstatements of the law.

Second, the jury was correctly instructed on the law of murder, degrees of murder, and voluntary manslaughter, pursuant to CALCRIM Nos. 500, 520, 521, 522, 570 and 571. CALCRIM No. 520, in particular, told the jury that malice may be express or implied and is express when it is based on an intent to kill. CALCRIM No. 570, in turn, correctly instructed the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant was provoked, and described the proper standard for finding provocation sufficient for voluntary manslaughter: "In deciding whether the provocation was sufficient [for voluntary manslaughter] consider whether a person of

27

average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

Third, the court instructed the jury pursuant to CALCRIM No. 200 to "follow the law" as the court explained it, even if the jury believed that the attorney's comments conflicted with the court's instructions. Absence of evidence that the jury was confused about the court's instructions, "[j]urors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Here, there is no evidence that the prosecutor's remarks confused the jury concerning the elements of, or the requirements for finding, voluntary manslaughter based on reasonable provocation. Nor is there any evidence that the jury did not follow the court's instructions.

Fourth, just before the prosecutor made his complained-of remarks to the jury, he correctly told the jury that voluntary manslaughter, based on a sudden quarrel or the heat of passion, required the jury to find that defendant "acted rashly under the influence of intense emotion that obscured his reasoning or judgment and the provocation would have caused a person of average disposition—not just the defendant's disposition—an average person's disposition to act rashly and without due deliberation."

Thus, we discern no reasonable likelihood that the jury construed the prosecutor's remarks as prohibiting it from finding defendant guilty of the lesser offense of voluntary manslaughter based on (1) a misunderstanding of the provocation necessary to reduce murder to voluntary manslaughter, or (2) because defendant acted with intent to kill.

D. *The Trial Court Did Not Err in Failing To Investigate Juror Misconduct*

Defendant next claims the trial court violated his due process right to a fair trial, and abused its discretion, in failing to investigate the possibility that a juror may have committed misconduct during deliberations. During deliberations, the foreperson reported that a juror, who was employed by Riverside County, may have read defendant's criminal case file before trial. We conclude that the court was not obligated to conduct any inquiry or to investigate the matter.

1. Relevant Background

During jury selection, the court asked the prospective jurors whether any of them had "any prior knowledge of the facts of this case." A prospective juror, later seated as Juror No. 9, raised her hand and said, "So I don't know, exactly, the case. But I used to work inside both Banning and Riverside jail as a correction sheriff's assistant. And if he was housed there, I probably touched his file. And I just wanted to let you know, like, if I . . . start hearing the case, I might have seen his file and things that are in it."

The court then asked Juror No. 9, "[W]hen you hear . . . his name, Cervantes, this is an . . . allegation of a murder and a shooting, does that sound familiar to you as you sit here?" Juror No. 9 replied, "Well, Cervantes is a very known last name. . . . And we go by last names. So I wouldn't be able to confirm that I do know and, for sure, have read his file." The court said, "Got it. So as you sit here right now, do you have any independent recollection or knowledge of what you think this case is about?" Juror No. 9 replied, "No," and the court thanked her for bringing the matter to the court's attention. Later during jury selection, when the prospective jurors were responding to a

29

questionnaire, Juror No. 9 said she was "a community service officer for the Riverside County Sheriff's Department here in Palm Desert." She said she could be fair, then she said, "But I also told you that I probably had access to his file; I worked in the jail before I became a CSO."

The jury began its deliberations on October 1, 2019, and reached its verdict and findings on the same day. During deliberations, the foreperson sent the court a note, saying, "My question is, one of the jury members may have read the Cervantes file before the case was heard. She is employed by . . . Riverside Co. The juror may or may not have read his file. The question is should this have some bearing on our decision. And one of the jury would like to speak to the judge."

In open court, the trial court read the note to counsel and noted that the court and counsel had discussed the matter "off the record." The court proposed and the prosecutor agreed that the court would respond to the first question by referring the jury to CALCRIM No. 101, and would respond to the second question by having the juror who wanted to speak to the court send the court a note stating what the juror wanted to discuss. Defense counsel "submitted" the matters to the court and did not object to the court's proposed responses.

The court returned the note to the jury with the following responses written on it: "Please refer to jury instruction 101, which states in part, 'Our system of justice requires that trials be conducted in open court with the parties presenting evidence and the judge deciding the law that applies to the case. It is unfair to the parties if you receive additional information from any other source because that information may be unreliable

30

or irrelevant and the parties will not have had the opportunity to examine and respond to it. Your verdict must be based only on the evidence presented during trial in this court and the law as I provide it to you.' [¶] Please have the juror who would like to speak to me send a note regarding what the juror wants to discuss."

Later on October 1, 2019, the jury returned its verdicts and findings. The jury did not ask any further questions about the juror who may or may not have read defendant's file, and the juror who wanted to speak to the court did not send the court a note saying what that juror wanted to discuss.

2. Applicable Law and Analysis

Defendant claims the court had a duty to investigate what the juror who reportedly "may have" read his file "may have shared with other jurors regarding [the juror's] knowledge of the contents of [his] court file." He claims the court abused its discretion in failing to investigate whether the juror in question, ostensibly Juror No. 9, disclosed any of the contents of his "court file"—actually, his "jail" file—during deliberations. We find no error.[6]

"The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests with the sound discretion of the trial court." (*People v. Ray* (1996) 13 Cal.4th 313, 343.) "But not

---

[6] Here, too, the People claim defendant has forfeited this claim of error by failing to object to the court's response and by failing to request a more extensive inquiry or investigation. We agree that the claim is forfeited. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 59.) But even if the claim had been preserved, we find it without merit.

every incident involving a juror's conduct requires or warrants further investigation." (*People v. Cleveland* (2001) 25 Cal.4th 466, 478 (*Cleveland*).)

"A trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.' " (*People v. Davis* (1995) 10 Cal.4th 463, 547 (*Davis*).)  Good cause to discharge a juror may exist when " 'the court is alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict.' " (*Cleveland*, *supra*, 25 Cal.4th at p. 477 [" 'Once the court is alerted to the possibility that a juror cannot properly perform his duty to render an impartial and unbiased verdict, it is obligated to make reasonable inquiry into the factual explanation for that possibility.' "].)

Here, the jury's note did not put the court on notice that there *may have been good cause* to discharge Juror No. 9.  Thus, the court did not abuse its discretion, or violate defendant's due process right to a fair trial, in failing to conduct an inquiry or an investigation to determine whether Juror No. 9 was committing misconduct by disclosing the contents of defendant's jail file to other jurors during deliberations.  The note did not raise the possibility that Juror No. 9 was committing any misconduct.

The note reported the same facts that Juror No. 9 reported during jury selection: that Juror No. 9 "may have" read defendant's file—his jail file—while Juror No. 9 was working in the Riverside County jail system, and that Juror No. 9 was currently employed by Riverside County as a community services officer or CSO.  During jury selection, Juror No. 9 could not recall whether she had read defendant's file but said she *may have* read the file.

The note reported nothing new.  Significantly, the note did not indicate that Juror No. 9 had read defendant's file or was disclosing the file's contents to the other jurors. To the contrary, the note simply stated that a juror—ostensibly Juror No. 9—"may or may not" have read defendant's file, in connection with her work in the Riverside County jail system, and asks whether *that fact* should have any bearing on the jury's deliberations.  The court appropriately answered that question in the negative by referring the jury to CALCRIM No. 101, and reminding the jury to base its decision solely on the evidence presented during the trial and the law as the court had instructed.

Defendant mischaracterizes the note as showing "that a juror discussed the subject of the contents of [defendant's] criminal file with the jury, and discussed his/her access to this file during deliberations."  But the note did not indicate that any juror had discussed the contents of defendant's criminal file, or the juror's access to the file, with other jurors. Rather, "[d]efendant merely speculates that there might have been jury misconduct." (*Davis*, *supra*, 10 Cal.4th at p. 548.)  Thus, the court had no duty to discharge Juror No. 9 or conduct an inquiry.  (*Ibid.*)

E.  *Defendant's Booking Fee and Presentence Investigation Report Fee Must Be Stricken*

At sentencing on November 15, 2019, defendant was ordered to pay the cost of his presentence probation report, in an amount and manner to be determined by the probation department, but not to exceed $1,095.  (Pen. Code, former § 1203.1b.)  The court also imposed a $ 514.58 booking fee.  (Gov. Code, § 29550.)  Defendant claims these two fees must now be stricken from his judgment of conviction and sentence pursuant to

Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (the bill or Assembly Bill 1869). We agree.

The bill's stated intention was to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system and to eliminate all outstanding debt incurred as a result of the imposition of [identified] administrative fees." (Stats. 2020, ch. 92, § 2.) The bill specifically abrogates the court's authority to impose and collect 23 different administrative fees. (*People v. Greeley* (2021) 70 Cal.App.5th 609, 625 (*Greeley*).)

Regarding defendant's booking fee (Gov. Code, § 29550), the bill added section 6111 to the Government Code effective July 1, 2021. (Stats 2020, ch. 92, § 11.) This new statute provides: "(a) On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to . . . Section 29550 . . . . as [the section] read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111.)

Regarding the costs of defendant's presentence investigation report, or probation report (Pen. Code, former § 1203.1b.), the bill repealed section 1203.1b (the courts' authority to impose the costs of presentence investigation reports), effective July 1, 2021. (Stats. 2020, ch. 92, § 47.) The bill also added section 1465.9 of the Penal Code, effective July 1, 2021. (Stats. 2020, ch. 92, § 62.) This new statute provides: "(a) On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section . . . 1203.1b . . . as [the section] read on June 30, 2021, shall be unenforceable and

34

uncollectible and any portion of a judgment imposing those costs shall be vacated." (Pen. Code, § 1465.9.)

Defendant claims Government Code section 6111 and Penal Code section 1465.9 require that the unpaid balances, if any, of his booking fee and the cost of his presentence investigation report (the fees) must be stricken from his judgment. The People agree only that any unpaid portion of the fees became unenforceable and uncollectible on July 1, 2021; therefore, they argue, it is unnecessary to strike the fees from defendant's sentence or judgment.

We agree with defendant that the fees must be stricken from the judgment. This result is required by the plain language of Government Code section 6111 and Penal Code section 1465.9. In identical terms, the statutes plainly direct that "[o]n and after July 1, 2021," the balance of any fees or costs described in each statute shall be "unenforceable and uncollectible *and* any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a), italics added; Pen. Code, § 1465.9, subd. (a).) The language of the statutes is mandatory—i.e., the judgment "shall be vacated." (*People v. Clark* (2021) 67 Cal.App.5th 248, 259 (*Clark*) [discussing Pen. Code, § 1465.9].)

This is not to say that Assembly Bill 1869 applies retroactively to nonfinal judgments on appeal, including defendant's nonfinal judgment. As *Greeley* explained, "we need not apply the presumption of retroactivity (see *In re Estrada* (1965) 63 Cal.2d 740), because by its plain terms the ameliorative changes of Assembly Bill 1869 apply retroactively to make any unpaid portion of the identified assessments, as they existed on

35

June 30, 2021, 'unenforceable and uncollectible' as of July 1, 2021. (Stats. 2020, ch. 92, §§ 11, 62.) In addition to making any unpaid portion of the identified assessments void by operation of law, however, the plain language of Government Code section 6111 and Penal Code section 1465.9 not only authorizes, but mandates, vacation of a portion of a judgment for the purpose of striking the now-unauthorized assessments . . . . Thus, although the unpaid balance of the identified fees is no longer enforceable and collectible, the statute *also* mandates that any portion of a judgment imposing those fees be vacated." (*Greeley*, *supra*, 70 Cal.App.5th at p. 626.) Thus, here, the unpaid balance of defendant's booking fee and the unpaid balance of the costs of his presentence investigation report, as of July 1, 2021, must be stricken from his judgment.

F. *Remand for Resentencing Is Also Necessary*

Defendant claims the matter must be remanded for resentencing so the court may decide whether to exercise its discretion to impose a lesser firearm enhancement than the 25-year-to-life term the court imposed on defendant's section 12022.53, subdivision (d) enhancement, for personally and intentionally discharging a firearm causing great bodily injury or death in the commission of the murder. We agree.

Section 12022.53 establishes a tiered system for sentencing enhancements for specified felonies involving firearms, including murder. The information alleged and the jury found that defendant personally and intentionally used a firearm causing great bodily injury or death to a person, not an accomplice, in the commission of the murder. (§ 12022.53, subd. (d).) No lesser included firearm enhancements were alleged or found true by the jury.

36

At sentencing on November 15, 2019, the court imposed a term of 25 years to life on defendant's section 12022.53, subdivision (d) firearm enhancement. No one, including defendant, asked the court to strike defendant's section 12022.53, subdivision (d) enhancement, in the interests of justice (§ 1385), under section 12022.53, subdivision (h). Nor did anyone ask the court to impose a lesser enhancement under section 12022.53, subdivisions (b) (10-year enhancement for personal use of firearm) or (c) (20-year enhancement for personal discharge of firearm).

At the time of sentencing, the Courts of Appeal were split on whether a trial court has authority, under section 12022.53, subdivision (h), to strike a firearm enhancement and impose a lesser one, not alleged or found true by the trier of fact. The court in *People v. Morrison* (2019) 34 Cal.App.5th 217 held that courts have the discretion to strike a section 12022.53, subdivision (d) enhancement and impose a lesser enhancement, even if the lesser enhancement was neither alleged nor found true. (*Morrison*, at pp. 222-225.)

Other courts, including this one, disagreed with *People v. Morrison*. (*People v. Tirado* (2019) 38 Cal.App.5th 637, 642-644, review granted Nov. 13, 2019, S257658; *People v. Yanez* (2020) 44 Cal.App.5th 452, 459-460, review granted Apr. 22, 2020, S260819; *People v. Garcia* (2020) 46 Cal.App.5th 786, 788-794, review granted June 10, 2020, S261772; *People v. Valles* (2020) 49 Cal.App.5th 156, 164-167, review granted July 22, 2020, S262757; *People v. Delavega* (2021) 59 Cal.App.5th 1074, 1086-1096, review granted Apr. 14, 2021, S267293; *People v. Hoang* (2021) 66 Cal.App.5th 1020, 1024, review granted Sept. 29, 2021, S270553.)

On January 20, 2022, our Supreme Court resolved this split of authority. In the lead case under review, *People v. Tirado* (2022) 12 Cal.5th 688, the court held that subdivision (j), rather than subdivision (h), of section 12022.53 authorizes courts to impose a lesser firearm enhancement after the court has exercised its discretion to strike a greater firearm enhancement under section 12022.53, subdivision (h), provided the facts required to prove the lesser enhancement were alleged and found true by the trier of fact. (*People v. Tirado*, at pp. 699-701.) "To summarize: When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53(d) enhancement, and the court determines that the section 12022.53(d) enhancement should be struck or dismissed under section 12022.53(h), the court may, under section 12022.53(j), impose an enhancement under section 12022.53 (b) or (c)." (*Id*. at p. 700.)

Here, the facts necessary to support a lesser enhancement under subdivisions (b) and (c) of section 12022.53 were alleged in the information and found true by the jury. The information alleged that, in the commission of the murder, defendant "personally and intentionally discharged a firearm and proximately caused great bodily injury or death to another person, not an accomplice." This effectively alleged that defendant personally *used* and *discharged* a firearm—the elements of the lesser enhancements under section 12022.53, subdivisions (b) and (c), respectively. (*People v. Tirado*, *supra*, 12 Cal.5th at p. 700.) Likewise, the jury's true finding on the section 12022.53, subdivision (d) allegation establishes that these *use* and *discharge* allegations were proven true. (*People v. Tirado*, at p. 700.)

The record does not indicate whether the trial court knew it had the discretion to strike defendant's section 12022.53, subdivision (d) enhancement under section 12022.53, subdivision (h), and impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), pursuant to its authority to impose enhancements under section 12022.53 subdivision (j). (*People v. Tirado*, *supra*, 12 Cal.5th at pp. 699-701.) The matter of striking defendant's section 12022.53, subdivision (d) enhancement, and imposing a lesser enhancement, was never raised at sentencing.

Thus, remand is required for the court to determine, in the first instance, whether to exercise its discretion to strike defendant's section 12022.53, subdivision (d) firearm enhancement under section 12020.53, subdivision (h). If the court exercises that discretion, it must then determine whether to impose a lesser firearm enhancement under section 1202253, subdivision (j).) The record does not indicate that remand for these purposes would be futile. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 424-428.)

## IV.  DISPOSITION

The judgment is reversed in part. On remand, the trial court is directed to amend the judgment to vacate (1) the portion of the $514.28 booking fee that remained unpaid as of July 1, 2021; and (2) the portion of the cost of the presentence investigation report, which was not to exceed $1.095 and remained unpaid as of July 1, 2021. (Gov. Code, § 6111, subd. (a); Pen. Code, § 1465.9, subd. (a).)

The matter is also remanded for resentencing, with directions to the trial court to consider striking or dismissing defendant's section 12022.53, subdivision (d) firearm enhancement and imposing a lesser firearm enhancement under section 12022.53,

subdivision (b) or (c).  (§ 12022.53, subds. (h), (j); *People v. Tirado*, *supra*, 12 Cal.5th 688.)  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:


RAMIREZ
P. J.


McKINSTER
J.